[Cite as *In re S.W.*, 2026-Ohio-2955.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [S.W., | : | No. 25AP-351 (C.P.C. No. 22JU-1689) |
| N.M., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [C.W., | : | No. 25AP-352 (C.P.C. No. 22JU-1686) |
| N.M., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [M.W., | : | No. 25AP-353 (C.P.C. No. 22JU-1688) |
| N.M., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [S.W., | : | No. 25AP-372 (C.P.C. No. 22JU-1689) |
| T.W., Father, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [M.W., | : | No. 25AP-374 (C.P.C. No. 22JU-1688) |
| T.W., Father, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

In the Matter of:                                     :

[C.W.,                                                :                    No. 25AP-375
                                                                    (C.P.C. No. 22JU-1686)
T.W., Father,                                         :                (REGULAR CALENDAR)

                        Appellant].                   :

---

D E C I S I O N

Rendered on July 31, 2026

---

**On brief:** *Jinx S. Beachler*, for appellant, N.M.

**On brief:** *Mitchell A. Williams*, Public Defender, and *George M. Schumann*, for appellant, T.W. **Argued:** *George M. Schumann.*

**On brief:** *Robert J. McClaren*, for appellee, Franklin County Children Services. **Argued:** *Robert J. McClaren.*

**On brief:** *Daniel Sullenberger*, guardian ad litem.

---

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

DINGUS, J.

{¶ 1} Appellants, N.M. ("Mother") and T.W. ("Father"), parents of minor children S.W., M.W., C.W., C.V.W., A.W., and S.L.W., appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch ("juvenile court" or "trial court"), placing the children in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we reverse and vacate the order of permanent custody of the children to FCCS and remand this matter to the juvenile court for further proceedings consistent with this decision and our instructions.

## I. Facts and Procedural History

{¶ 2} Mother and Father are the parents of six minor children: S.W., M.W., C.W., C.V.W., A.W., and S.L.W. ("the children"). The parents immigrated to the United States as refugees from Congo; Father arrived in 2001, and Mother arrived in 2014. The family

moved to Columbus, Ohio, from Michigan in 2021. Mother is fluent only in French. Father speaks three languages: Swahili, Lingala, and English.

{¶ 3} On February 17, 2022, police officers were dispatched to the parents' home after workers from a pest control company reported finding M.W., then five years old, unsupervised in the basement covered in feces. According to complaints later filed in these cases, C.W. and C.V.W., three-year-old twins, were found in a bedroom locked from the outside, and A.W. and S.L.W., two-month-old twins, were found in the master bedroom with Mother, who was sleeping. S.W., a six-year-old boy, was at school when officers arrived. Father returned home shortly after officers arrived. Mother and Father were arrested, transported to the Franklin County Jail (jail), and charged with first-degree felony offenses relating only to M.W. The children were removed from the home and placed in the emergency custody of FCCS.

{¶ 4} The following day, FCCS filed complaints alleging that S.W., A.W., and S.L.W. were dependent children and that M.W., C.W., and C.V.W. were abused, neglected, and dependent children. At a preliminary hearing conducted on February 22, 2022, the trial court granted FCCS temporary custody of the children. The parents, who remained incarcerated, were not present for the hearing. On February 25, 2022, the court filed an "Addendum" with the Clerk of Courts scheduling a "video/telephone hearing via Zoom" for March 23, 2022. Three days later, on February 28, 2022, FCCS requested that the Franklin County Sheriff's Office ("Sheriff") serve the complaints and notice of the hearing on the parents. On March 2, 2022, the Clerk of Courts instructed the Sheriff to serve a "(09) - Miscellaneous Paper or Order" on the parents at the jail. The Sheriff perfected service of that document on the parents at the jail on March 7, 2022.

{¶ 5} On March 23, 2022, the trial court proceeded with the scheduled "video/telephone hearing," treating it as both an adjudicatory and dispositional hearing. Still incarcerated, the parents were not present, and counsel did not appear on either parent's behalf. The court neither heard sworn testimony nor took any evidence at the hearing, but instead proceeded on an uncontested basis, finding S.W., A.W., and S.L.W. to be dependent children and M.W., C.W., and C.V.W. to be abused, neglected, and dependent children. The court then immediately conducted a dispositional hearing, finding that all parties waived the requirement contained in Juv.R. 34 that the dispositional hearing be

conducted at least one day after the adjudicatory hearing. The court granted FCCS temporary court custody of all the children. As for visitation, FCCS's attorney represented to the court that, as a condition of bond in the parents' criminal cases, the criminal court had ordered the parents to have no contact "with alleged victim or any co-defendant." (Mar. 23, 2022 Tr. at 17.) At the Guardian Ad Litem's ("GAL") request, the court ordered that the parents have no contact with any of the children, not just M.W., who was the only alleged victim in the criminal cases. On April 28, 2022, a case plan was filed with the Clerk of Courts, which included the stated goal of reunifying the children with their parents.

{¶ 6} FCCS moved for permanent custody of the children on December 19, 2022—while the juvenile court's no contact order as to all of the children was still in place—alleging that it had "made a good effort to implement the [case] plan" and that the parents had failed "to substantially remedy the conditions" that led to the children's removal from the home. (Memo in Support of Mot. for Permanent Custody at 4.) Attorneys were later appointed for Mother and Father. On February 21, 2023—more than one year after the children were initially removed from their home—those attorneys appeared on behalf of the parents at an annual review hearing and requested that the no-contact order be terminated and that the parents be allowed to visit the children. Mother had been released from custody in May 2022, and Father had been released in August 2022; Father pleaded guilty to attempted child endangering, a felony of the fourth degree, in August 2022; Mother pleaded guilty to criminal mischief, a misdemeanor of the third degree, in December 2022. Father was sentenced to a period of probation, but his probationary terms *did not* prohibit him from having contact with any of the children. Mother received a sentence of time served, with no additional sanctions.

{¶ 7} The GAL objected to the termination of the no-contact order, asserting that the parents had not yet engaged in case plan services and that "it would be extremely traumatic and dangerous for their mental health if they were sent to visitation with people that they basically don't know." (Feb. 21, 2023 Tr. at 19.) No evidence from a mental health professional was presented to the court to substantiate the GAL's concerns. The parents' attorneys argued that the parents had, in fact, engaged in case plan services by attending and successfully completing a parenting assessment and parenting classes. The trial court granted the parents' request for supervised visits with the children, to begin once they

engaged in case plan services, which could be "in the smallest of ways." (Feb. 21, 2023 Tr. at 21.)

{¶ 8} FCCS filed a second permanent custody motion on May 24, 2023, which included an additional assertion that the children had been in FCCS custody for at least 12 of the last 22 months. The following day, the court conducted a pre-trial conference on FCCS's motions. Despite the trial court's prior order granting the parents' request for visitation, visits had not yet occurred. The court entered an interim order that same day granting the parents weekly visits with the children for 2 hours at FCCS, which began in late May 2023.

{¶ 9} On July 21, 2023, Mother filed a motion to dismiss the complaint and the motions for permanent custody, asserting, among other things, a violation of her fundamental due process rights. Father likewise filed a motion to dismiss, also arguing a violation of his fundamental due process rights.

{¶ 10} The trial on the motions for permanent custody and the parents' motions to dismiss began June 13, 2024. The hearing spanned six days over approximately three- and one-half months, concluding September 30, 2024. FCCS presented testimony from the assigned caseworker, Jazzmyne Milton, and the lay GAL, Stefanie Coe. Both parents also testified during FCCS's case-in-chief and again during their respective cases-in-chief.

{¶ 11} Milton testified that she was assigned to the case when it opened in February 2022. She subsequently met with Mother at the jail, accompanied by a French interpreter, to inform her of the allegations in the complaint. Milton initially testified that she met with Mother twice at the jail, on February 24 and March 2022. On cross-examination, however, she testified she met with Mother only once at the jail, on March 17, 2022—less than one week before the adjudicatory and dispositional hearing. Milton recalled informing Mother at that meeting of the allegations in the complaint, the terms of the case plan, and that she had a right to request an attorney by appearing on the fifth floor of the Franklin County Courthouse, but she did not recall whether she informed Mother of any hearing dates. Milton testified that she met with Father at the jail in February 2022 and communicated similar information to him.

{¶ 12} Milton further testified that reunification was the primary goal of the case plan and that it required the parents to: (1) complete a mental health assessment and follow

through with any recommendations; (2) complete a psychological evaluation; (3) complete a parenting assessment and parenting classes and follow through with any recommendations; (4) obtain and maintain stable housing; (5) obtain and maintain employment; (6) sign releases of information; and (7) demonstrate appropriate parenting practices and display knowledge learned in parenting classes.

{¶ 13} Milton testified that Father completed a mental health assessment and had complied with a recommendation to engage in regular counseling, which he has attended once a month since completing the assessment. As for Mother, on cross-examination Milton acknowledged that Mother had informed her that she completed a mental health assessment on May 29, 2024, with Community for New Directions, and that Mother signed a release of information on June 4, 2024, to confirm her attendance; however, as of September 4, 2024—three months after making her initial request—Milton had not received a response from the provider, and she had not followed up on the request. Both parents also completed a psychological evaluation, which led to a recommendation to engage with a parenting coach. While Milton testified on direct examination that the parents refused to comply with this recommendation, on cross-examination she admitted that, although the parents had initially refused to work with a parenting coach, they had since agreed to do so, and that the nine-month delay in connecting them with a coach was due to factors outside of the parents' control. As of September 2024, the parents had agreed to work with the Bair Foundation for parenting assistance.

{¶ 14} Milton also testified that the parents completed parenting assessments and parenting classes in 2022, obtained stable housing and full-time employment in 2023, cooperated with her in signing releases of information, and consistently visited the children once the no-contact order was terminated. She did not, however, believe that the parents had achieved the case plan objective of demonstrating appropriate parenting practices during their supervised visits with the children or of displaying the knowledge they had learned in parenting classes. Milton acknowledged the parents had requested a change in the location of the visits—either to their home or, at a minimum, to a different, less sterile environment. But, according to Milton, such alternative arrangements were not possible because FCCS policy required that the visits be held and supervised at FCCS's offices. On cross-examination, however, Milton admitted she could not locate any written policy to that

effect. At the conclusion of her testimony, Milton recommended that FCCS be granted permanent custody of all the children.

{¶ 15} The GAL also recommended that FCCS be granted permanent custody of all the children. In support of that recommendation, she testified that "[the parents] have demonstrated no change in behavior from my first interaction with them and the allegations in the complaint to today," and that she had seen no bond between the children and the parents at any of the visits she attended. (Sept. 24, 2024 Tr. at 38.) The GAL also testified that she has never supported unsupervised visits with the parents at any stage of the case and continues to oppose the current two-hour supervised visits with the children. In fact, the trial court's March 23, 2022 no-contact order was issued at her request. She explained that she sought the order, in part, because "there were court orders in the criminal cases that parents were to have *no contact with the children*, so I felt it was important for the juvenile court in [this case] to be aware of that and to mimic or repeat those orders." (Emphasis in original.) (Sept. 24, 2024 Tr. at 97.) She has maintained that position throughout the proceedings and reiterated it at every hearing conducted in the case.

{¶ 16} The GAL also testified that she believed the terms of the case plan were appropriate and generally sufficient to address the family's needs. Like Milton, she acknowledged the parents had completed a parenting assessment and parenting classes, a mental health assessment, and psychological evaluations; obtained housing and full-time employment; consistently visited the children; and had made diligent efforts to engage with a parent mentor. Nevertheless, she opined that the parents had failed to demonstrate the behavioral changes or parenting skills they should have acquired by completing the case plan objectives. On cross-examination, however, she acknowledged she had never requested any modification to the case plan to provide the parents with additional services or opportunities to acquire that knowledge or develop those skills.

{¶ 17} Both Mother and Father testified that they substantially completed their case plan objectives: they successfully completed parenting assessments and parenting classes, even before they were permitted to have any contact with the children; they completed mental health assessments–Father at North Central Mental Health Services and Mother at Community for New Directions; Father complied with the recommendation that

he attend monthly counseling sessions; they both completed psychological examinations with Forum Ohio; they both agreed to work with a parenting coach as recommended; they both obtained steady employment, even agreeing to change their work schedules to accommodate the caseworker's schedule; they obtained stable housing by renting a home that could accommodate all the children; they both regularly attended visits with the children once they were finally permitted contact with them, missing only two visits, one due to a car accident and the other due to appearing 20 minutes late to the visit, against FCCS policy; and they repeatedly requested that the frequency and duration of the visits be increased, but those requests were consistently opposed by both FCCS and the GAL. The parents testified that, if the children are returned, they intend to remain employed by their current employers, but they will adjust their work schedules so that one parent is always available to care for the children. Specifically, Mother would work Friday through Sunday, while Father would work Monday through Friday. The parents also testified that they are willing to have FCCS remain involved with the family to ensure they are providing the children with appropriate care.

{¶ 18} Father also sought to have an employee of the Bair Foundation testify in his case-in-chief virtually by video. While the record is less than clear, the employee appears to have refused to testify because the Bair Foundation would not permit her to do so, possibly due to privilege concerns. Father's attorney requested a continuance, presumably to identify the basis of the refusal to testify, but the trial court abruptly denied the request during the following exchange:

> ATTORNEY CRAFT: I apologize but at this time I would be requesting a continuance -
>
> [THE COURT]: Denied.
>
> ATTORNEY CRAFT: - to either sec -
>
> [THE COURT]: Denied. You'll have your opportunity to proffer.
>
> ATTORNEY CRAFT: Understood. Thank you.
>
> [THE COURT]: You're very welcome.

(Sept. 30, 2024 Tr. at 68.)

{¶ 19} In compliance with the trial court's directive, Father's attorney summarized the testimony that she anticipated eliciting from the witness, which was drawn from Milton's activity log notes from March 1, 2024, relating to a conversation between Milton and the witness. Milton noted that the witness expressed several concerns, among them being: that the foster mother would not allow the children in her care to call the parents "mom" or "dad" any longer; that "the children appear bonded to the parents and the parents appear bonded to the children"; that "with proper education that any concerns could be alleviated and believes that the parents could ultimately provide a safe stable home for the children"; that it would be "devastating to the children to be permanently exercised [sic] from their parents; and that the children were being stripped of their natural background. (Sept. 30, 2024 Tr. at 69.)

{¶ 20} The trial court issued its written decision six months after the conclusion of trial, on March 31, 2025, granting FCCS's motions for permanent custody. In the decision, the court found that *all six children* were previously adjudicated to be abused, neglected, and dependent children, and that they had been in the temporary custody of FCCS for longer than 12 months of a consecutive 22-month period. The court also found that FCCS made reasonable efforts to reunify the children with their parents and that the granting of permanent custody was in the children's best interests, finding, among other things, that the children are not bonded to the parents, and that they "have taken little assertive action or independent measures to reunite with their children." (Mar. 31, 2025 Decision & Entry at 19.) Also on the same day, but in a separate written decision, the court denied the parents' motions to dismiss.

{¶ 21} The parents have timely appealed the trial court's decision granting permanent custody to FCCS and its denial of their motions to dismiss.

## II. Assignments of Error

{¶ 22} Mother appeals and assigns the following five assignments of error for our review:

[I.] Mother's rights to due process were violated.

[II.] FCCS did not make reasonable efforts to reunify the children with the Appellant Mother prior to the filing of PCC.

[III.] The trial courts [sic] granting the PCC was against the manifest weight of the evidence.

[IV.] The trial court granting the PCC was an abuse of discretion.

[V.] The trial court granting the PCC was plain error.

{¶ 23} Father appeals and assigns the following three assignments of error for our review:

[I.] The juvenile court abused its discretion and committed reversible error when it denied the father an opportunity to reunite with his children, by ordering that the father have no contact with his children and by approving and adopting a case plan that prohibited parent/child visitation, in violation of the father's fundamental liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[II.] The juvenile court committed reversible error, by finding that FCCS made reasonable efforts to assist the parents with remedying the conditions causing the removal, when it terminated the parental rights of the father, in violation of the father's fundamental liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[III.] The juvenile court's judgment that the father had abandoned the minor children, and that permanent court commitment of the minor children to Franklin County Children Services was in the minor children's best interests is against the manifest weight of the evidence.

## III. Discussion

{¶ 24} Mother's first assignment of error contends that her fundamental due process rights were violated when the trial court proceeded with the adjudicatory hearing in her absence and without counsel. In Mother's four remaining assignments of error and all of Father's assignments of error, they generally challenge the trial court's decision to award permanent custody of the children to FCCS and to deny their motions to dismiss. We will first address Mother's first assignment of error, as it is a threshold issue concerning the trial court's jurisdiction over the parents. Because they involve interrelated issues

concerning the trial court's award of permanent custody, we will then address the parents' remaining assignments of error collectively.

### A. Mother's First Assignment of Error: Due Process

{¶ 25} In her first assignment of error, Mother argues that she was denied due process when the trial court conducted an adjudicatory hearing without providing her with either the complaint or the case plan translated into her native language, French, prior to the hearing. FCCS argues that Mother waived this argument by failing to appeal the trial court's April 11, 2022 decision granting temporary custody of the children to FCCS. In the alternative, FCCS argues that Mother was afforded due process because she received notice of the adjudicatory hearing, was provided with a translated copy of the case plan, and, after being provided notice of her right to counsel, failed to request the appointment of counsel prior to the hearing.

{¶ 26} Parents have a fundamental right to parent their children, subject to the protections of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000); *In re C.F.*, 2007-Ohio-1104, ¶ 28. At a minimum, due process requires notice and an opportunity to be heard. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314.

{¶ 27} In the context of abuse, neglect, and dependency actions, those due process rights also include "a hearing upon adequate notice, assistance of counsel, and (under most circumstances) the right to be present at the hearing itself." *In re Grant*, 2001 Ohio App. LEXIS 440, *11 (10th Dist. Feb. 8, 2001). To ensure that parents are afforded those due process protections, Ohio has adopted R.C. 2151.35, which requires the court to "give all parties to the action . . . notice of the adjudicatory and dispositional hearings in accordance with the Juvenile Rules." R.C. 2151.35(C). Pursuant to the Juvenile Rules and following the filing of a complaint in juvenile court, the court must issue a summons to the parents, Juv.R. 15(A), which must be served in accordance with the Civil Rules, Juv.R. 16(A). The

summons must, among other things, order the party to appear at a stated time and place, inform the party of their entitlement to an attorney and to have an attorney appointed if the party is indigent, advise the party that the complaint seeks an order of temporary custody that will cause the removal of the child from the parent's custody, and be accompanied by a copy of the complaint. Juv.R. 15(A). Among other methods, the summons and complaint may be served personally on the parent by a county sheriff. Civ.R. 4.1(B)(1). If service is completed, the sheriff "shall endorse that fact on the process and return it to the clerk." Civ.R. 4.1(B)(2)(a). If the court fails to serve a summons pursuant to these rules, the court lacks personal jurisdiction over the parent. *In re J.T.*, 2019-Ohio-465, ¶ 31 (4th Dist.), citing *In re Z.H.*, 2013-Ohio-3904, ¶ 14 (9th Dist.). "A judgment rendered without personal jurisdiction is void ab initio." *Madorsky v. Radiant Telecom, Inc.*, 2006-Ohio-6409, ¶ 11 (8th Dist.), citing *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision*, 87 Ohio St.3d 363, 366 (2000). A court can also obtain personal jurisdiction over a party by voluntary appearance of the party or the party's attorney, or waiver. *Maryhew v. Yova*, 11 Ohio St.3d 154, 156 (1984).

{¶ 28} Mother does not argue either in her motion to dismiss or on appeal that the trial court lacked personal jurisdiction because she was not timely served with the summons. Instead, she argues only in general terms that her due process rights were violated, largely because she did not receive French-language versions of the complaint and case plan before the adjudicatory hearing, although she did acknowledge in an affidavit filed with the trial court on July 21, 2023 that she received an English-language version of the complaint while she was incarcerated. Mother cites to no authority holding that the failure to provide a party with a translated copy of a complaint, standing alone, constitutes a denial of due process, and our research has disclosed none. Under the circumstances presented here, we decline to recognize such a rule.

{¶ 29} As to whether the trial court lacked personal jurisdiction due to the failure to serve Mother with a summons before the adjudicatory hearing, she has waived that issue on appeal by failing to argue it in her brief. *Thompson v. Preferred Risk Mut. Ins. Co.*, 32 Ohio St.3d 340, 342 (1987) ("where an issue presented for review by the appellate court was not briefed and argued below, the issue is waived for purposes of consideration on appeal"). But that is not to say that we do not have serious concerns about the adequacy of

service of process in this case.  Juv.R. 16(A) requires the court to serve a summons, along with a copy of the complaint, on a parent in an abuse, neglect, and dependency action.  The record as it existed at the time of the adjudicatory hearing contains no document bearing the word "summons."  It does, however, contain a document titled "Notification," filed with the court on March 1, 2022, which appears, in substance, to comply with Juv.R. 15(B).  FCCS requested that both the complaint and the "Notification" be personally served on the parents by the Sheriff.  Yet the court's instructions, filed on March 2, 2022, command the Sheriff to serve only a "miscellaneous paper or order," with no reference to a summons, a complaint, or even the "Notification."  In its return filed with the court on March 8, 2022, the Sheriff indicated that it served "[n]otice and any other document indicated on the Court Instructions" on both Mother and Father at the jail on March 7, 2022.  This stands in contrast to service of the later permanent custody motion, which was accompanied by a "Summons and Order to Appear."   The process server's return, filed on January 11, 2024, acknowledges that copies of the "summons, motion, [and] order to appear" were personally served on both Mother and Father on January 10, 2023, which is materially different from the service of a "miscellaneous paper or order."  Accordingly, we are concerned that neither Mother nor Father was properly served with a summons in accordance with Ohio's rules of procedure before the adjudicatory hearing.  Nevertheless, we may only address arguments properly presented by the parties, and in the absence of such an argument in the parents' briefs (or their motions to dismiss), we must overrule Mother's first assignment of error.

### B. The Remaining Assignments of Error

{¶ 30} In Mother's four remaining assignments of error and Father's three assignments of error, the parents generally argue that the trial court erred in awarding permanent custody of the children to FCCS.  We agree.

{¶ 31} Parents have a constitutionally protected fundamental interest in the care, custody, and control of their children.  *In re B.C.*, 2014-Ohio-4558, ¶ 19, citing *Troxel* 530 U.S. at 65; *In re Murray,* 52 Ohio St.3d 155, 157 (1990) (recognizing the right to raise one's children is a basic and essential civil right).  However, these rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child.  *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979); *In re D.A.*, 2007-Ohio-1105, ¶ 11.  In certain circumstances, therefore, the state may terminate the parental rights of natural parents

when such termination is in the child's best interest. *D.A.* at ¶ 11, citing *Cunningham* at 105. Because termination of parental rights "has been described as 'the family law equivalent of the death penalty in a criminal case,' " parents " 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 32} R.C. 2151.414 governs the termination of parental rights. *In re K.H.*, 2008-Ohio-4825, ¶ 42. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that: (1) one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so. *In re Z.C.*, 2023-Ohio-4703, ¶ 7. Clear and convincing evidence is the measure or degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Clear and convincing evidence requires more than a mere preponderance of the evidence, but less than proof beyond a reasonable doubt, as in criminal cases. *Id.*

{¶ 33} An appellate court will not reverse a trial court's determination on a permanent custody motion unless it is not supported by the sufficiency of the evidence or it is against the manifest weight of the evidence, depending on the nature of the arguments presented by the parties. *See Z.C.* at ¶ 18 (rejecting use of the abuse of discretion standard in reviewing permanent custody determinations under R.C. 2151.414 and clarifying that separate standards for sufficiency and manifest weight of the evidence apply instead). The manifest weight of the evidence standard concerns the effect of the evidence in inducing belief. *Z.C.* at ¶ 13, citing *State v. Thompkins*, 1997-Ohio-52. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. Furthermore, "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be used as a substitute for the separate

sufficiency and manifest-weight analyses appropriate for permanent-custody determinations." *Id*. at ¶ 15.

{¶ 34} The trial court found that FCCS proved by clear and convincing evidence that the children were abandoned under R.C. 2151.414(B)(1)(b), and that they had been in FCCS's temporary custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d).  While a trial court need only find that one of the factors under R.C. 2151.414(B)(1) has been proven, "we have held that a trial court's application of . . . multiple factors is not prejudicial." *In re A.M.*, 2025-Ohio-2993, ¶ 21 (10th Dist.); *see also In re N.W.*, 2008-Ohio-297, ¶ 9 (10th Dist.) ("a trial court may cite more than one factor in the alternative"); *In re D.G.*, 2009-Ohio-7232, ¶ 39 (10th Dist.) (though the trial court unnecessarily addressed both R.C. 2151.414(B)(1)(a) and (d), "any error in doing so was not prejudicial").

{¶ 35} The parents do not dispute that the children have been in FCCS's temporary custody for more than 12 months, albeit in part because they were prohibited from having any contact with them for more than 12 months.  Accordingly, we find that 1 of the 5 factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies.  We decline to address whether the trial court also erred in finding that the children were abandoned, as it is unnecessary to our finding that 1 of the 5 factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies, rendering the question moot.  *State v. Gideon*, 2020-Ohio-5635, ¶ 26 ("an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court.").

{¶ 36}  Having found that R.C. 2151.414(B)(1)(d) applies, we now turn to the trial court's finding that FCCS proved by clear and convincing evidence that an award of permanent custody is in the children's best interests, and that FCCS made reasonable efforts to prevent or eliminate the need for removal of the children from their home and to return the children to the parents' care.  To determine the best interest of a child, R.C. 2151.414(D)(1) directs the court to consider "all relevant factors," including those enumerated in R.C. 2151.414(D)(1)(a) through (e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 37} The factors in R.C. 2151.414(E)(7) through (11) include (1) whether the parent was convicted of or pleaded guilty to certain criminal offenses, (2) whether the parent repeatedly withheld medical treatment or food from the child, (3) whether the parent put the child at a substantial risk of harm due to substance abuse, (4) whether the parent abandoned the child, and (5) whether the parent's parental rights were terminated regarding a sibling of the child.

{¶ 38} Here, the trial court addressed the R.C. 2151.414(D)(1)(a) through (e) best interest factors and made the following findings: (a) the children are not bonded to the parents and that a no-contact order was in place "due to the seriousness of the offenses"; (b) the children are unable to express their wishes with respect to permanent custody; (c) the children have been in the temporary custody of FCCS for more than 12 months; (d) the parents had no relatives available to care for the children; and (e) the parents were charged with kidnapping, domestic violence and endangering children, Mother was convicted of criminal mischief and Father was convicted of attempted endangering children, and they were "ordered to have no contact with the children as a condition of bond in the criminal case." (Mar. 31, 2025 Decision & Entry at 6.) The court also considered "other relevant factors," including that the parents have not admitted to any wrongdoing

and that "they have taken little assertive action or independent measures to reunite with their children."[1] (Mar. 31, 2025 Decision & Entry at 19.)

{¶ 39} We will address each best interest factor in turn, starting with R.C. 2151.414(D)(1)(a). The trial court found that the parents were ordered, as a condition of the bonds in their criminal cases, to have no contact with any of the children. That finding was clearly erroneous. The bond conditions prohibited the parents from having contact **with only M.W.**, who was the sole alleged victim named in the indictments. Moreover, even that limited prohibition was later lifted—for Mother when she was released from jail on May 10, 2022, and for Father when he was sentenced to probation on August 10, 2022, the terms of which did not prohibit him from having contact with M.W. The evidentiary basis for the trial court's erroneous finding traces, in significant part, to the GAL's testimony at trial. The GAL testified that the trial court prohibited the parents from having contact with **all the children** as a condition of their bonds, and that she "felt it was important for the juvenile court in the A/N/D case to be aware of that and to mimic or repeat those orders in their - - in the juvenile court orders." (Sept. 24, 2024 Tr. at 97.) This testimony was, at best, misleading: it expanded a no-contact condition applicable to a single child into a blanket prohibition covering all the children—a distortion adopted by the trial court. Separately, FCCS has compounded this error in its appellate brief by asserting that the bond condition applied to "the alleged victims (the children)," citing a statement purportedly made by the assistant prosecutor at the adjudicatory and dispositional hearing. (Appellee's Apr. 23, 2026 Brief at 45.) FCCS, however, gratuitously converted the singular to the plural. In his comments to the court, the assistant prosecutor referred to a single alleged victim—not to all the children; unfortunately, this mischaracterization of one named victim as many has recurred throughout the history of this case. We are gravely concerned that FCCS, the GAL, and the trial court relied, in part, on faulty information to completely exclude the parents from the children's lives for more than 15 months. We therefore conclude that the trial court's factual finding—that the parents' bonds included a no-contact order applicable to all the children—was clearly erroneous. We further conclude that this erroneous finding was foundational, in that it plainly affected the "interaction and

---

[1] The trial court mistakenly relied on a previous version of R.C. 2151.414(D), but since there are no substantive differences between the best interest factors contained in the previous version and the current version, we find the error to be clerical in nature.

interrelationship of the child with the . . . parents," and, in turn, materially impaired the parents' ability to develop and maintain bonds with the children. R.C. 2151.414(D)(1)(a).

{¶ 40} We next address the R.C. 2151.414(D)(1)(b) and (c) best interest factors. Under R.C. 2151.414(D)(1)(b), a court must consider the wishes of the child, as expressed directly by the child or through the child's GAL. Although the trial court references the children's limited verbal skills at the time of their removal, it acknowledges that even as of September 2024—two and one-half years after their removal from the home—the children remained incapable of expressing their wishes, largely due to their young ages. We agree with the trial court that this factor is not applicable and that it should not play a role in the court's analysis. Turning to R.C. 2151.414(D)(1)(c), a court must consider the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. All parties agree that the children have been in the temporary custody of FCCS for at least 12 of the last 22 consecutive months. We note, however, that the trial court's analysis under this factor contains an erroneous finding. The trial court found that all the children were adjudicated to be abused, neglected, and dependent. That finding is incorrect. Only M.W., C.W., and C.V.W. were adjudicated to be abused, neglected, and dependent children, while S.W., A.W., and S.L.W. were adjudicated to be dependent children. As with the erroneous bond-condition finding we identified above, this mischaracterization of the adjudications is the type of factual imprecision that, left uncorrected, risks distorting the trial court's weighing of the best interest factors.

{¶ 41} We now turn to the R.C. 2151.414(D)(1)(d) best interest factor, which requires a court to consider whether the child's need for a legally secure placement can be achieved without a grant of permanent custody to FCCS. The trial court's consideration of this factor was deficient. The court found only that a legally secure placement could not be achieved without a grant of permanent custody to FCCS, as no relatives were available to care for the children. In so finding, the trial court confined its inquiry to the availability of relatives and entirely omitted any consideration of whether the parents themselves could provide a legally secure permanent placement. The phrase "legally secure permanent placement" has been interpreted "to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). Accordingly, a trial

court's analysis under R.C. 2151.414(D)(1)(d) must extend beyond the mere availability of relatives and encompass a consideration of the parents' ability to provide such an environment. *See, e.g., A.M.*, 2025-Ohio-2993, at ¶ 28-30 (10th Dist.) (consideration of evidence that mother obtained housing, employment, and complied with the case plan as relevant to R.C. 2151.414(D)(1)(d)); *In re J.W.*, 2023-Ohio-1582, ¶ 50 (10th Dist.) (reviewing a parent's argument about case plan compliance under R.C. 2151.414(D)(1)(d)); *In re G.T.*, 2023-Ohio-3649, ¶ 91-103 (10th Dist.) (same); *In re J.H.*, 2021-Ohio-807, ¶ 47-57 (10th Dist.) (same).

{¶ 42} Here, the record contains substantial evidence bearing directly on the parents' ability and willingness to provide a safe, stable, and consistent environment for the children. The trial court discussed the parents' home, their employment, their completion of mental health assessments, including ongoing counseling, their completion of parenting assessments and parenting classes, and the parenting skills that may or may not have been exhibited during visits. Yet the court in no way connected any of those findings to its analysis under R.C. 2151.414(D)(1)(d). That consideration—linking the evidence of parental capacity or incapacity to the legally secure permanent placement inquiry—is entirely absent from the trial court's decision.

{¶ 43} We must also address a factual error in the trial's characterization of the parents' evaluations. The trial court found that Father completed a "psychiatric evaluation." As an initial matter, Mother and Father were not required to complete a psychiatric evaluation; the case plan required only a psychological evaluation. Further, the trial court's only stated basis for finding that Mother completed her evaluation was from her own testimony that "she did not know whether or not she completed a psychological evaluation, but that she 'did everything that was asked.' " (Mar. 31, 2025 Decision & Entry at 12.) The record, however, reflects that Mother did in fact complete a psychological evaluation. Milton testified on cross-examination by Mother's attorney as follows:

> Q. And in fact, not only did the - - the father do a psychological my client also did a psychological and complied, correct?
>
> A. Correct.

(Sept. 4, 2024 Tr. at 85-86.)

{¶ 44} Milton's testimony thus establishes that both parents completed the required psychological—not psychiatric—evaluation and complied with that case plan objective. In sum, although the trial court discussed the evidence presented at trial regarding the parents' home, their employment, and their progress, or lack thereof, on case plan objectives, the court failed to connect that evidence to its analysis of the R.C. 2151.414(D)(1)(d) best interest factor—or, for that matter, to any of the R.C. 2151.414(D)(1) best interest factors. We are therefore unable to conclude that the trial court properly considered whether the parents could provide a legally secure permanent placement for the children, and we find this omission constitutes a further deficiency in the trial court's best interest analysis.

{¶ 45} We next address the trial court's consideration of the best interest factors under R.C. 2151.414(D)(1)(e), which permits a court to consider any factor listed under R.C. 2151.414(E)(7) to (11). The trial court's analysis focused on R.C. 2151.414(E)(7). That section enumerates specific predicate criminal offenses, and under the plain language of the statute, the court may consider only those enumerated offenses and only when the parent has pleaded guilty to or been convicted of them.

{¶ 46} Here, the trial court's analysis under R.C. 2151.414(E)(7) is flawed in three respects. First, the court found that "[b]oth parents were criminally charged with kidnapping, domestic violence and endangering children." (Mar. 31, 2025 Decision & Entry at 18.) But criminal charges are not convictions. *See State v. Holdcroft*, 137 Ohio St.3d 526, 530 (2013) ("a conviction is composed of a finding of guilt and a sentence"). Under the plain language of R.C. 2151.414(E)(7), only offenses resulting in a guilty plea or conviction may be considered; the mere pendency or filing of criminal charges does not meet the statutory threshold. The charged offenses identified by the trial court, therefore, may not be considered under this section.

{¶ 47} Second, the trial court repeated its erroneous finding regarding the parents' bond conditions in their criminal cases—an error we have already identified and addressed above. The persistence of this factual error across multiple sections of the trial court's decision underscores the degree to which it infected the court's analysis.

{¶ 48} Third, the actual convictions identified by the trial court—Mother's conviction for criminal mischief, a third-degree misdemeanor, and Father's conviction for

attempted child endangering, a fourth-degree felony—are not among the criminal offenses enumerated under R.C. 2151.414(E)(7). Because neither conviction falls within the statutory list, neither may serve as a predicate under that section.

{¶ 49} In sum, none of the criminal grounds cited by the trial court satisfy the requirements of R.C. 2151.414(E)(7). The charged offenses fail because they are not convictions, the bond condition finding is erroneous, and the actual convictions are not enumerated under the statute. The trial court's reliance on R.C. 2151.414(E)(7) in its best interest analysis is therefore unsupported.

{¶ 50} Lastly, we turn to the trial court's consideration of other relevant factors. The court found that the evidence clearly and convincingly showed that the parents refused to admit to any wrongdoing and that they "had taken little assertive action or independent measures to reunite with their children." (Mar. 31, 2025 Decision & Entry at 19.) While we agree that the evidence establishes the parents did not admit to any wrongdoing, the court's latter finding must be viewed in light of the parents being effectively barred from meaningful contact with their children for an extended period, rendering a finding of parental indifference fundamentally unreliable.

{¶ 51} As set forth in detail above, we have examined each of the R.C. 2151.414(D)(1)(a) through (e) best interest factors the trial court considered in its decision and have identified several errors, including foundational errors, that pervaded the court's analysis. After weighing the evidence and all reasonable inferences relating to the best interest factors, and considering the credibility of the witnesses, we find that the trial court erred by finding that FCCS proved by clear and convincing evidence that an award of permanent custody is in the children's best interests. We further find that the trial court clearly lost its way and created such a manifest miscarriage of justice that its decision awarding permanent custody must be reversed. Thus, we find the trial court's decision granting permanent custody of the children to FCCS to be against the manifest weight of the evidence. Accordingly, we sustain Mother's third assignment of error and Father's third assignment of error. Because our decision to sustain the parents' third assignments of error is dispositive of this appeal, we find their remaining assignments of error moot.

## IV. Disposition

{¶ 52} Accordingly, we overrule Mother's first assignment of error, sustain Mother's and Father's third assignments of error, and render moot Mother and Father's remaining assignments of error. We therefore reverse and vacate the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, awarding permanent custody of the children to FCCS. We reinstate temporary custody of all six children to FCCS, and remand this matter to that court for further proceedings consistent with law and this decision. On remand, the juvenile court is instructed to: (1) order FCCS to prepare and maintain a new case plan consistent with this decision, to include, at a minimum, expanded and meaningful visits sufficient to afford the family a genuine opportunity to achieve the case plan goal of reunification, and (2) conduct such further hearings as may be necessary thereafter. Nothing in this decision should be construed as expressing any view on whether FCCS should be granted permanent custody of the children if such a request is made in the future. We observe, however, that Mother's and Father's parental rights were wrongfully terminated on the basis of the pervasive errors detailed in this decision, and the parents have now gone several years without having any contact with their young children—a separation that originated, in significant part, from the foundational error we have identified. The passage of time does not diminish the gravity of these errors; rather, it compounds the harm to the children. Thus, we encourage the juvenile court to act expeditiously in carrying this judgment into execution.

*Judgment reversed and vacated*;
*cause remanded with instructions.*

EDELSTEIN and LELAND, JJ., concur.